Golden Harvest Dairy Company, Appellant, vs. Department of Agriculture and Markets, Respondent.

*May 12—September 12, 1939.*

*Joseph Lieberman* of Milwaukee, for the appellant.

For the respondent there were briefs by the *Attorney General* and *R. M. Orchard,* assistant attorney general, attorneys, and *Fred M. Wylie* of Madison of counsel, and oral argument by *Mr. Wylie* and *Mr. Orchard.*

The following opinion was filed June 30, 1939:

NELSON, J.   Since the findings of both the department and the reviewing court are asserted to be without support in the evidence, it will be necessary briefly to review the facts. Lincoln Dairy Company for some time operated in the Milwaukee field as a milk dealer.   Its license was revoked on November 9, 1937.   Shortly thereafter, the plaintiff was organized by Sam Berlin, his wife, and son.   None of the latter had been identified or connected with Lincoln Dairy Company.   On December 23, 1937, the plaintiff applied for a dealer's license for the year 1938.   A hearing had upon that application resulted in its denial principally upon the ground that the department was not satisfied that Berlin, his wife, and son were the sole owners thereof, and that some of the former owners of Lincoln Dairy Company were not still connected therewith.   In March, 1938, the plaintiff again applied for a license and a hearing thereon was duly had. At that hearing it was concluded that Berlin, his wife, and

son were actually the sole owners of the stock and that no others were interested in the plaintiff. The financial setup of the plaintiff was deemed satisfactory by the department after Berlin, as president, had deposited certain of his stocks, bonds, and life insurance in trust with the department, and the plaintiff had executed a chattel mortgage on its equipment, all for the benefit of producers, and to assure payment for milk purchased from them. The department apparently insisted that the plaintiff be wholly divorced from those who had been connected with Lincoln Dairy Company. Upon the hearing Berlin testified that no one who had been connected with Lincoln Dairy Company would be connected with the plaintiff, that he did not intend to use any of the drivers formerly employed by that company; that an entirely new setup as to personnel would be effected; that the men to be engaged would be men never connected with Lincoln Dairy Company. As a condition of obtaining a license Berlin made promises to the department in accordance with his testimony. A writing was executed by the plaintiff, in which it was stated:

"The Golden Harvest Dairy Company hereby covenants and agrees with the department of agriculture and markets of the state of Wisconsin, that it will not either in the conduct of its business or otherwise allow any ownership, employment, use of money or credit of any of the former owners or drivers of the Lincoln Dairy Company in the Golden Harvest Dairy Company except as the department may approve the employment of one driver whose qualifications have already been discussed with the department."

When the plaintiff, on November 15, 1938, applied for a 1939 license, the department served a complaint and notice of hearing upon it for the purpose of determining whether a 1939 license should issue. Upon that hearing evidence was adduced tending to show that the plaintiff had employed Louis Goldstein as a driver and Julius Buran as a solicitor, both of whom had been in the employ of Lincoln Dairy Com-

pany; that during the fall of 1938, Isidor Goldstein, one of the former owners of Lincoln Dairy Company, several times had obtained gasoline at a filling station then patronized by the plaintiff, which he charged to the plaintiff and which charges were approved and paid by Berlin; that Buran, as a solicitor, had offered discounts to prospective customers; that discounts had been paid to at least two customers by persons who represented themselves to be connected with the plaintiff; that in several instances free milk had been given to customers; that the plaintiff had purchased from the receiver of Lincoln Dairy Company its equipment which included bottles, caps, and cases, which the plaintiff used after engaging in business under its 1938 license, and that the plaintiff had not kept satisfactory records of loadings and returns of unsold milk and cash. The evidence tending to show that the plaintiff had sold milk below ordered minimum prices, had given discounts, rebates, and free milk was vigorously disputed. The evidence relating to the purchase of gasoline by Isidor Goldstein upon the credit of the plaintiff was explained by witnesses adduced by the plaintiff which tended to show that the gasoline purchased by him was for Louis Goldstein's car, and that consequently he, Isidor Goldstein, was in no way the beneficiary of the gasoline so obtained. At the time of the hearing, Isidor Goldstein could not be found by the officer who was seeking to serve a subpœna upon him.

Sec. 100.03 (7), Stats. 1937, provides:

"All questions of fact under this section shall be determined by the department, in written findings, and the provisions for judicial review of orders or regulations made under this section shall be as prescribed in chapter 102 in so far as the provisions thereof are applicable."

That section renders applicable to a review by the court of orders of the department, the law that is applicable to a review of orders and awards of the industrial commission.

That law is so well established as to make it unnecessary to do more than to refer to it.

"If there is any credible evidence to support the findings of the commission they cannot be disturbed." *Milwaukee E. R. & L. Co. v. Industrial Comm.* 222 Wis. 111, 114, 267 N. W. 62.

We have carefully read all of the testimony adduced upon the hearing and conclude that the circuit court was right in saying that the findings adverted to by him were supported by the evidence.

Assuming, as we think we must, that the findings of the department were properly found by the trial court to be supported by the evidence, do such findings justify the action taken by the department in denying a license to the plaintiff?

The milk-control statute, sec. 100.03, was enacted for the purpose of preventing unfair methods of competition and unfair trade practices in the sale and distribution of milk, and to that end authority to license dealers was given to the department. Sec. 100.03 (4) (a), (b). Pars. (c) and (d) provide:

"(c) The department shall issue license to each person making proper application and who is fit and equipped for the business. Licenses may be denied, suspended or revoked by special order after notice and hearing as provided in section 93.18, when the applicant or licensee is unfit or unequipped for the business.

"(d) Under paragraph (c) the department shall consider, in addition to other matters, the character and conduct, including past compliance or noncompliance with law, of the applicant or any person to be connected with the business, and the financial responsibility of the applicant. . . ."

It appears from these paragraphs that a license may be denied when the applicant or licensee is unfit or unequipped for business, and that in determining whether an applicant is unfit or unequipped for business the department shall consider the character and conduct, including past compliance or noncompliance with law, of the applicant or any person to be

connected with the business. When the department was convinced that the plaintiff had violated its promise not to employ anyone formerly connected with Lincoln Dairy Company, and had violated both the statute and market orders by selling milk below minimum ordered prices by means of discounts, rebates, and free milk, can it be said that the department, in the performance of its duty, acted arbitrarily when it denied the plaintiff a license? In our opinion it cannot. While the evidence relating to Isidor Goldstein perhaps does not convincingly show that he was connected with the plaintiff or had a financial interest therein, it does permit of such an inference. The credibility of the witnesses and the weight of the evidence relating to that issue were for the department.

If the order of the department were based solely upon the use by the plaintiff of the caps, bottles, and cases which it had purchased from the receiver of Lincoln Dairy Company, we would hesitate to say that such use of equipment constituted a sufficient reason for denying a license or amounted to a violation of any of the provisions of sec. 97.60, Stats., which relate to false branding of weight, measure, count, or contents. We have grave doubts that the legislature intended that a milk bottle should be considered as a package or be within the definitions found in subs. (3) and (4) thereof, which provide:

"(3) The term 'label,' as used in this section and in section 97.25, or in any other section of the statutes, relating to the adulteration or misbranding of food, unless otherwise specifically described and provided therein, shall apply to any printed, pictorial, or other matter upon or attached to any package of a food product or any container thereof.

"(4) The term 'package' as applied to articles of food shall mean a closed receptacle of any kind in which an article of food is kept in stock and *which with its contents is sold to the public.*"

This doubt is increased when the provisions of sec. 98.12, Stats., are considered. That section relates to standard

bottles for the sale of milk or cream. The evidence shows that at the time of the hearing the plaintiff had ceased using Lincoln Dairy Company caps, had purchased many new bottles for its use but still used many of the cases purchased from the receiver.

Besides asserting that both the findings of the department and the reviewing court are not supported by the evidence, the plaintiff contends that subs. (4) (a), (b), (c), and (d); (5) (a) and (7) of sec. 100.03, Stats., are unconstitutional. We shall not determine the constitutionality of those sections because, in our opinion, the plaintiff is not in a position to assail them on that ground. It seeks a milk-dealer's license under the very act which it contends is unconstitutional. This it may not do. In *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 442, 87 N. W. 561, the relator there sought to compel the Wisconsin board of medical examiners to grant to him a license to practice medicine and surgery in this state. It was there held that where one seeks to compel the issuance to him of a license to practice medicine under a law of this state he cannot be heard to assail the validity of a provision of that law on the ground that it is unconstitutional. It appears that the plaintiff applied for a license under sec. 100.03. Upon a denial of his application, the plaintiff commenced an action to review the order of the department. Since he is seeking to procure a license under sec. 100.03, he may not in the same proceedings assail the statute on constitutional grounds. Compare *Pera v. Shorewood,* 176 Wis. 261, 186 N. W. 623; *State ex rel. Bluemound Amusement Park v. Mayor,* 207 Wis. 199, 240 N. W. 847; *Derong v. Industrial Comm.* 209 Wis. 88, 244 N. W. 591. As was said in the *Kellogg Case, supra:*

"Were he being prosecuted for practicing medicine without a certificate, he would be in a different situation."

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, with $25 costs, on September 12, 1939.